The first is a cluster of cases. I'll just read the first case named Barber v. Nestle USA, and I gather we're doing 30 minutes a side, undifferentiated, a single lawyer arguing each side. Is that how you're going to arrange it? That's correct, Your Honor. That's correct, a single person for the plaintiffs. And generally you don't have to use all your time. I'm not sure there's a half hour worth of things to argue here. Your Honor, Steve Berman on behalf of the plaintiffs, and I don't plan on using all my time. And in fact, we've briefed this seven times. So I'm going to focus primarily on the duty of disclosure. Okay. And if you can keep your voice up, that would be helpful, please. And rest on the others unless you have questions. Okay. And starting on the duty of disclosure, there are three facts that I think frame the duty of disclosure that are contained in the Attorney General's amicus brief. The first fact, and the Attorney General's California Transparency and Supply Chains Act resource guide for all these facts. The first fact is that human trafficking and slave labor generates $150 billion in illegal profits, making it the second largest criminal enterprise in the world. The second fact that I think helps frames the issue is that the resource guide has made a finding that consumers are often unaware that the product they are purchasing is the result of either human trafficking or slave labor. And the third point that I think helps frame the debate here is that the resource guide finds that consumers are increasingly demanding transparency and they're willing to pay more for a product that is free of slave or human trafficking. So those three points then give rise to the duty of disclosure issue. It is our court contention, Your Honors, that the Wilson case, which imposes a duty only when there's a safety concern, and that's the finding of the courts below in that regard, that that case has been clarified or modified by three California court of appeals decisions such that it's no longer good law. And those three California court of appeals cases are, and how far do they expand on what Wilson says? The three cases are the Collins case, the Rutledge case, and the Rubenstein case. And my view of the Collins case, it says the following. Deceit encompasses suppression of fact by one who is bound to disclose. And the failure to disclose is triggered by two things. And was the Collins case the floppy disk problem? Yes, Your Honor. Okay. So it was a physical characteristic of the product itself rather than anything in the means of production of that product? That's right. Okay. And what the court said is the failure to disclose is triggered by materiality and the four Lomardi factors. And the Lomardi factor here is did defendants in this case have it? Collins was technically decided just before Wilson, like the day before. It was. Yes. And there's no indication from the Wilson decision that the Wilson panel had an opportunity to review that decision. It's not cited at all. But for purposes of our on-bank applications, we have to assume that they were. So let's go to the next one. The next one is a later case, the Rutledge case, which comes two or three years after the Wilson decision. And in the Rutledge case, the court went to great pains, I submit, to say that the cases that the Wilson case relied on, and that is the Doherty case and the Barden case, did not, as a matter of California law, require that there be a safety concern. Right. And the Rutledge case is the one where the screen darkens, as it should not. So again, it's the physical characteristic of the product itself rather than anything used to produce the product and sort of the chain of production. Yes. Okay. Got it. And I'll get back to that point in a second. The third case is the Rubenstein case. And the Rubenstein case dismissed the complaint. But the importance, I think, of the Rubenstein case is it's the third case that went right to the issue of, is there a material disclosure and is one of the Lamarty factors triggered? So it didn't even mention Wilson. And I think it's significant because by this time, by 2017, in light of Collins and Rutledge, the California courts of appeals are now just getting right to those factors. I have a question. Sure. Has our court in a published opinion relied on Wilson since Collins and Rutledge? I can answer that question, Your Honor. I have a little chart. The only two published decisions that cite Wilson, I think, are the Williams v. Yamaha case, 2017, and the Daniel v. Ford case, 2015. And I think the issue that comes to mind on this issue is that both the court, the district courts in the Norrica v. Sampson case and the Lenovo case felt that, although they weren't bound to follow the Wilson case anymore, because they had felt they had a duty, that there was now subsequent binding authority from the California courts that indicated that Wilson, which had relied on Doherty and Barden, was no longer good law. Quote, Rutledge has very recently clarified that this is a misreading of California law, end quote. And I submit to you that the Where is that from that you're reading? I'm quoting from a case called Norcia, N-O-R-C-I. But that's not one of our cases. That's a district court case. Right. It's looking back on what's happened in California law and deciding that, as the courts have now spoken in California, that it felt it had a duty to follow that California decision. And I think this Court has ruled in Alvarez that a prior decision of the Ninth Circuit is only binding in the absence of any subsequent indication from the California courts that our interpretation was incorrect. And here I submit to the Court there are three indications that the Wilson decision is incorrect. So then if you agree with the plaintiffs that Wilson needs to be modified, or if you have any doubt about the issue, it's clear that the courts below are struggling with it. They see these California decisions. They see Wilson. They see an inconsistency. And they're also all over the map on what Wilson means. If the Court has any doubt about the need to change Wilson, then we submit that you grant our motion to certify the question to the California Court of Appeals. You mean to the California Supreme Court? California Supreme Court. Yeah. Sorry, Your Honor. So that gets really to — But in order to do that, we need to be able to, because the California rules require it, certify to the Court that the answer will be dispositive. Yes. And in order to do that, we have to be convinced that if the concept applies to anything beyond safety, it applies to your circumstances, which, as Judge Fletcher was suggesting, are quite different from the circumstances in any of the cases that you're relying on. There's two cases that I suggest answer the question that Judge Fletcher was raising. And those two cases are Kasky v. Nike and the QuickSet case. And those two cases stand for the proposition — Where are those cases? Those are California Supreme Court cases. Yes. And they stand for the proposition that it's not the functionality of the product that gives rise to a duty to disclose. So for example, in Nike v. — in Kasky v. Nike, the Court ruled, for a significant labor practice — But those weren't cases about a UCL obligation to disclose, were they? Yes, they were, Your Honor. And — Well, if they were, then we wouldn't be having a problem. Well, QuickSet was a CLRA case and a UCL case, and the issue — But they weren't about — oh, okay. So why don't they solve our problem, then? Why are we struggling? Well, I do think — I don't think there's a problem. I think QuickSet, which talked about the materiality and the right of consumers to know whether food was harvested or product manufactured by union workers and whether you had a right to know whether your diamond was conflict-free. And what was the holding in the case? The holding was that you did have a right to know those things, and they needed to be disclosed in both QuickSet and Kasky. And in QuickSet, the issue was, was it, you know, made in America? And the Court said people want to know where it's sourced from, and that's a material fact to a consumer. Could you remind me of what the precise holding of the California Supreme Court was in the Nike case? I understand that the underlying issue was conditions in which the Nike shoes were produced abroad, but what was the precise holding of the court in that case? My recollection was that there was a duty to disclose the labor practices involved in making the Nike products. And that case, of course, precedes our Wilson case? Yes, it does. But I thought it was a more technical standing sort of an issue. It was a standing issue. Right. Okay. So you really ought to be a little more forthright. It did not decide the issue that is before us. Is that correct? It did not. It did not, but you said it did. Well, it did. It's clear. Maybe you call it dicta. But it's clear that in reaching the standing decision, the Court said the plaintiff had standing because the plaintiff had an interest in receiving the same type of information. Correct. And then, nonetheless, he had an interest, i.e., he had standing, but it could be that he still can't get the relief he's asking for because an omission is inactionable, and they didn't reach the second question. Is that right? That's right. Yeah, yeah. So you did not, in fact, describe that in its full dimensions. I'll say it that way. Okay. That's a fair point, and I apologize for that. But the point I was trying to make was that both the Caskey v. Nike case and the Kwikset case found that materiality, whether it's in a standing context or not, that how a product is produced is material. You have to have materiality or close to it to get standing. Well, how? Let's suppose. Let's assume for now. I don't know whether we ourselves can get beyond Wilson. I mean, I understand your point that the California cases seem to have moved further, but we have our own internal rules about our banks and so on. So we may have a problem, but let's assume for the moment we don't so that we can at least go as far as Collins and Rutledge and say that there are some instances in which there's not a safety issue in which you can do this. But then what I am asking you essentially is what rule are you asking for after that? What I'm asking for, what I think the rule that comes out of Collins, Rutledge, and certainly Rubenstein is there's a duty to disclose when something is material and when one of the four Lamardi factors is met. And in this case, the factor that we believe is met is exclusive knowledge by the defendants. I'm sorry, I didn't hear that. Exclusive knowledge by the defendants, the second Lamardi factor. Exclusive what by the defendants? Knowledge. Knowledge, okay. But this is the problem. There are all manner of things that affect what people want to buy. Some people will care about the labor that goes into the project. And other people will care about environmental issues. And other people will care about whether it was made in America. And other people will care about, you know, whether it was made in Indiana. So what exactly is, you have a very complicated label at that point. So what is it that has to be disclosed? I think the label would not be complicated. It would say the following. This product, supply chain, may be infected by slave material. But that's, of course, your problem. But I'm telling you there are all kinds of other problems that people may have. Well. That they care about. And sincerely and really care about. So in this case. They don't want any meat products in there because they're strict vegans. So what is it has to be disclosed? It has to, there has to be a disclosure. Of what? That this product may result from child or slave labor. I understand. You're not engaging in what I'm trying to ask you. Which is what, okay. You get your label. All right. Now I show up and I say. Well, I think you need to have a label that says there are no meat products in here. So now you add a label that says there are no meat products in here. Or there are meat products in here. And then the third person shows up and says. I want to know whether it's made in America. So you put in, well, that's not made in America. And at that point, you have a very complicated label. So what's the limit? What's the measure here? I understand your question. And I think the measure is twofold. One, is it, the Rubenstein case gives an example. In the Rubenstein case, the court looked at two things. Is it material? And the court found it wasn't material. The consumers had no expectation. That was not prevalent in that case. And two, is there exclusive knowledge? In that case, there was no exclusive knowledge because the consumer could look at the clothing in the store and realize that the workmanship was shoddy. So that doesn't get out of the gate. And I suggest in answer to your question here. But I can't look and know whether it has any meat products. Let me continue. To answer your question here, we have two things that I think trigger the duty to disclose that we often don't have. First is, the defendants in their own corporate documents have admitted that materiality of the supply chain and the use of slave labor and forced labor is material to their consumers. They have said it. Now, I come forward in lots of consumer cases. I don't usually have corporate documents saying that what I'm asking you to disclose is admitted by you to be material. So that, I think, raises this case up to a level that normally you don't see. And the second issue that I think triggers a duty to disclose here is the fact that the exclusive knowledge factor. I mean, the consumer. And they say it isn't. You don't. I guess for two reasons they claim that they don't have exclusive knowledge. One is they don't have very good knowledge themselves because they're way down the chain. And secondly, so the best they're going to be able to say is it might have child labor or the worst forms of child labor or slavery. Well, aside from that, doesn't the disclosures under the, whatever it's called, the Supply Chain Transparency Act destroy your exclusive knowledge argument? I don't think so, Your Honor. Why not? How can it still be exclusive if it's on the website? Okay. So here's what they know. They've admitted this is a problem in their supply chain. Right? It's in Nestle's papers. They're working with the fishing companies, are working with a subsidiary that's producing fish that's made from sea slaves. They clearly have superior knowledge. A consumer walking into a supermarket to buy a chocolate bar, I don't think the cases suggest that the consumer can't. Well, they can look at the website, you know, and know as much as they would find out from the disclosure you want on the label, can't they? I mean, you're not going to put all that on the label. If they're required to look at the website. But the cases that have. Well, that means it's not exclusive, the knowledge. The cases that have dealt with this issue, for example, Judge Koh in the Elias v. HP case and Torres v. J.C. Penney, what they've looked at is, is it exclusive at the point of sale? And the reason for that. Oh, I don't think so. I think you're, I mean, that's quite a stretch, you know, to say it was exclusive in this case. Well, the plaintiffs allege, and certainly on a pleading standard, that they did not know at the time of purchase that their product was polluted with slave or child labor. So that should be taken as true. But the question for exclusive knowledge is what does exclusive knowledge mean within the meaning of the California case law? And I think it's superior knowledge. Not just, but that superior is a very different word from exclusive. I understand that. But the courts have interpreted, for example, the My Ford Touch case addressed that very issue. The court said we're not going to be bound by rigid notions of what's exclusive. We're going to look at whether the corporation is in a superior position to know this information. Got it. And as Judge Alsop said, when dealing with this issue with the General Motors case, he said, look, this is the Falk case, which was cited with approval by the California Court of Appeals and Collins. The court held that GM was in a superior position to know that its speedometers might fail. And Judge Alsop held they were not required prior to purchasing to have done Internet research. And so Collins cited that with approval, and we think that should apply here. These companies clearly had superior knowledge. Well, but this is, I think, different. You can correct me if I'm wrong in the sense that in the General Motors case, for example, you would have had to do research. You would have had to start from scratch and try and find the answer to this question. There wasn't a designated website to go to to find out the answer to the question. Here, and I'm not getting into the safe harbor issue, but there is, in fact, because of a state requirement, a manufacturer by manufacturer by product, as I understand it, website that provides. I understand that the questions that are being answered are more in the nature of what do we know, but the problem is that it certainly will get you to the same place, which is it may be. There may be. We're not sure. Right? Isn't that basically what it says? Yes, but let's take that a little bit further. So there's nothing in the legislative history or the disclosures of the Supply Chain Act that would tell you which companies, for example, there's nothing that would tell you that the seafood companies are using slave labor or seal slaves out of Thailand. I thought each manufacturer has to do this. Is that wrong? Each manufacturer do what? Has to have this disclosure. In the supply chain, yes. Right. So what do you mean it wouldn't tell you what companies? Well, I don't think it would tell you that the cat food you're buying is made from slave labor. To my knowledge, you couldn't find that on the website. Well, then what's on the website? But even more importantly, the tests that the California courts, Collins and Rutledge and Rubenstein, have placed on the duty of disclosure is you're looking at the test from a reasonable consumer. And I submit to the court that a reasonable consumer, prior to buying a chocolate bar, is not required to go do research about whether or not that chocolate bar is the product of human trafficking. Why would a reasonable consumer even think that? The average reasonable consumer going to, as Judge Koh points out, you have to have a reason to make an inquiry. Why would they have that reason to begin doing research on whether the product is human trafficking? The defendant, on the other hand. Well, there's some tension between saying that it's really important to them and saying they wouldn't try to find out. It was relatively easy to find out, right? But, again, I would say if I want to buy a product that's free of human trafficking, which the Attorney General says most consumers do, I go into a store, why would I even be on inquiry notice that I should ask? But the defendant in this case, each of the defendants, is in a superior position to have made a disclosure. And the reason they don't want to make that disclosure is they know that two things are going to happen. Either people are not going to buy that product and they're going to go look for a product that is free from such a taint, or they're not going to be willing to pay the same price. That's why they're not making this disclosure. Unless you have other questions, I'm going to reserve the rest of my time. Okay, let's hear from the other side, and you've then saved some time. May it please the Court, my name is Steve Raber, and I represent Mars, who is a defendant in two of these cases, the Hodgson chocolate case and the Worth seafood case. I plan to address the duty to disclose issue and related issues, including the certification request to the California Supreme Court. Mr. Merriman, who is seated at the council table, represents Purina in two of the cases, and he plans to address the safe harbor argument. And you split your time roughly? I'm going to try and go about 20 minutes. Okay. Despite an unbroken line of ten decisions from this Court and four district court judges below, the plaintiffs argue for a new and unprecedented duty. Wait a minute. There are ten decisions since Wilson's, ten published decisions? Including Wilson's, starting with Long v. Hood. Including published, all published decisions? There are three published decisions. Right, exactly. You know, we've been having this problem all week, and I've noticed that the briefs have started to do this. We really mean it when we say we're really not interested in the unpublished opinions. Okay. Well, I understand that they're not binding, but I think they can be persuasive, perhaps. And so we do have an unbroken line, certainly of published decisions as well. And these cases can be affirmed by a straightforward application of Wilson v. Hood package. But it doesn't seem right in terms of California law, does it? Well, it does. I mean, California law, unless the California Court of Appeals justices don't know California law, it isn't what they're saying about California law. Well, they are. I think that, I take it you're asking about Collins and Rutledge. Well, of course. And neither one involves safety. Well, that's right. And so here's where we have to go back to basics. The Seeley case set the standard for public policy, which basically said that a consumer can't be charged that if they buy a product, they're going to get injured. But they can be fairly charged with the risk that what they buy is not going to live up to their economic expectations, unless the manufacturer tells them that it will or agrees that it will. And so that was the starting point for Daugherty and Barton, which are really the seminal cases here, which basically said that there are three circumstances in which somebody has a duty to disclose. If you give a warranty, if you make an affirmative misrepresentation, or if there's a safety concern. And so the safety issue is only one source of a duty to disclose. So in Rutledge, for example, Rutledge said you don't need a safety concern. Well, that's because in Rutledge the defect manifested within the warranty period, that's one category of disclosure, and that the, it was alleged that the defendant made misrepresentations that created a duty to disclose. That's a second source of a disclosure. And so Hewlett-Packard in that case was forced into a position of arguing, well, it still has to be safety. And the Court of Appeals did the unremarkable thing of saying you don't need safety, i.e., you've already got a warranty and you've already got a specific misrepresentation, which is exactly what the Wilson Court held. The Wilson Court said absent a warranty, you have a duty to disclose in two circumstances. If you lie about your product, you make an affirmative misrepresentation, or if there's a safety concern. So Rutledge fits comfortably within Wilson because it involved two of the three categories for a duty to disclose. And similarly, Collins involved a case where the defect occurred within the warranty period. And I know it was an unpublished opinion, but in the VIT case, this court in 2012 denied a rehearing and discussed Collins and said it doesn't alter the Doherty Rule and said that it would be surprised if the California Supreme Court were to go that far. So Collins and Doherty, I mean, Collins and Rutledge fit comfortably within Wilson. There's no change there. And, in fact, just this March in Williams v. Yamaha, this court reaffirmed Wilson, and we went back and looked and the plaintiffs cited Rutledge in their reply brief and argued Rutledge in their reply brief, and notwithstanding that, this court reaffirmed the Wilson Rule in Williams v. Yamaha. So the other cases mentioned by counsel as reflecting some change away from Wilson were the Kasky and Kwikset cases. And in addition to the questions your honors had, those are very different cases because those are both affirmative misrepresentation cases. In the Kasky v. Nike case, there was a representation made about what the labor conditions were within the plant, and they were false. And in the Kwikset case, there was a representation that these locks were made in the USA. That was false. And so all those cases stand, the proposition those cases stand for is that if you say something, you make an affirmative misrepresentation, you have a duty to disclose the facts that will correct that misrepresentation. And on the Rubenstein point, Rubenstein's a Just back up for a minute. Sure. Rutledge. I'm trying to read Rutledge carefully here, and I don't see any mention of the warranty period point. I'm sorry, of? You said essentially that Rutledge was not inconsistent with Wilson because For two reasons. I know the reasons. I heard what you said. But if you actually read the opinion, they don't mention those reasons. They say quite broadly that there's not either a dowry nor a bargain precluded duty to disclose material information known to a manufacturer and concealed from a consumer. And they say that they talk about Collins, and they say that there was a duty to disclose the material which affected its product. It didn't say anything about an affirmative statement. It didn't say anything about a warranty period. It just says. Your Honor, page 1176, the court said that specific misrepresentations in press releases and advertising created a duty to disclose the known defects. Now, I've got a printed out version of this. Can you help me with pagination as if it were from the Cal Reporter? Because I've got pagination for that. Page 421. 421. Okay. So. It says appellants point to specific misrepresentations. I'm on 421 in the sense of one of these irritating bolded things in the middle of a paragraph. So help me out. Then there's a paragraph that begins similarly here. Then there's a paragraph that begins HP argues. Then there's a paragraph that begins moreover. Where are we? It's the one right after moreover. Okay. Appellants point to. Okay. So now where's your language? Specific misrepresentations in HP's press releases and advertising that created a duty to disclose the known defects in the notebook computers. That's the moreover. Well, anyway, I don't read it that slippage at all. And on page 419 it says appellants argue, assert that HP was obligated to disclose the inverter defect because it was contrary to HP's advertising about the notebooks and was material to the proper functioning of the notebook computers. So this is a case where they're making affirmative statements that are false unless you disclose things to correct the misimpression. And as to the defects occurring during the warranty period at page 418, it says Degenshine experienced problems with his display screen blacking out shortly before the expiration of his one-year warranty. That particular plaintiff, though, didn't notify until later. So he lost his warranty claim. And then further, the next paragraph, Giuliano Garamani purchased the Zinfandel 3.5 notebook computer in January 2002 and experienced problems with the display screen in November 2002. So both of these experienced problems within the warranty period, which is a category that falls squarely within the Wilson test. Can you point? So far you've not done so. Can you point us to language in Rutledge which makes the warranty period relevant? Not off the top of my head, but that is. You seem to know the opinion very well and everything else. Well, I go back to Doherty. So my question is, can you point me to language in Rutledge that discusses relevance of the warranty period? And so far you've said no, you can't. Now, what I can point to is that Doherty and Barden both held that the fact it was important that the defect arise within the warranty period. Otherwise, you would have an end run around the warranty laws. You would essentially give a warranty for the life of the product, and that was Barden, and that was Doherty, and that policy was recognized in the Wilson case as well. So it's a very significant limitation. And so as I said, because of that, in Rutledge, because the court found essentially two sources of a duty to disclose, that it was within the warranty and there were misrepresentations. But it sounds as though they didn't rely on the warranty period, unless you can point me to language that says that. It's the reason why Hewlett-Packard had to come back and argue that you have to have a safety concern. And so that's why then the Rutledge court went on and said, you don't necessarily need to have a safety concern. And that's consistent with Wilson, because under Wilson, it's either within the warranty period, an affirmative misrepresentation, or a safety concern. Those are the three categories. Well, your argument seems to amount to something like this, alleging a defect within the warranty period that's covered by the warranty, in effect amounts to a misrepresentation in terms of Wilson. If the manufacturer had knowledge of it and failed to disclose it. And that's the second part of Wilson, where you see cases out there that talk about whether consumer complaints are enough to impute knowledge to the manufacturer. You're right, they would have a warranty claim. But if they could show that the manufacturer had actual knowledge that this kind of stuff was going to happen in the warranty period and didn't disclose it, they can be liable under Wilson under those circumstances, under those statutes. So I want to talk also about the warranty period. Martin Lashkay says, HP's argument that the expiration of the warranty period precludes a claim for fraudulent concealment of the UCL is incorrect. That's right, because there were misrepresentations. And so misrepresentations give rise to a duty to disclose, regardless of what the warranty period is. You can't lie about your products. And you have a duty to disclose things that would correct that misrepresentation. So I'd like to talk about the reasonable consumer expectations and why that's another basis to dismiss similar to what happened in the Ebner case, which is that there is no reasonable expectation here that these products are completely free of slave labor in an international supply chain. You know, if you went home to 100 people on the street and asked whether they thought their chocolate was made with slave labor, they'd probably say no. They'd probably think they had a reasonable expectation that it wasn't. Well, I think that the complaint here, however, alleges the opposite, Your Honor. The complaint alleges that people are willing to pay a premium for a certification, that it's free. But you said that people don't have a reasonable expectation that their product isn't made with slave labor. Here's my point, that they have a next they have, if they're willing to pay a premium for that certification, that means one of two things. They either have no expectation at all, but when they know about the issue, they're willing to pay more to have that, or that they accept that there is some risk of slave labor, and that's why they're willing to pay more in order to have that certification. It's not an unfamiliar concept. People don't assume that something's organic unless it says it is. Well, that's because people understand that it's something people know about. They know that there were a lot of pesticides, and now some people would prefer to avoid the pesticides. But on this question, maybe you're saying, well, a lot of people just haven't thought about it. That's probably true. But if you asked them, what's your reasonable expectation, most people don't think there is slavery in the world anymore, incorrectly, and they would think that it wasn't made with slave labor, and they might express discomfort now if they knew it. So that would lead, Your Honor, to the conclusion that a significant portion of the population, when they go in, they just don't have an expectation one way or the other, and so they're not being deceived. I really don't understand what you're saying. You mean because they're not thinking about it at the moment? It's not something they're thinking about, is that what you're saying? I'm saying they're not being deceived. There's nothing that's false that's said. Nobody's being tricked here. The plaintiffs expressly dropped their misrepresentation claim in the district courts. So we have no statements at all on the label, and we have statements. But the argument isn't that they are being tricked. The argument is they don't have this knowledge. If they were given the knowledge, they would change their behavior, and that strikes me as absolutely likely. Of course, they would, which is why you guys don't want to disclose it. I get that part, too. Well, but the question really is, are members of the public likely to be deceived? Not would they want to know something or not. Well, but you see, that may be relevant on your view of the case, but, of course, if it really is deceit, then it fits easily within the California case law with which you're comfortable. What you're resisting is reading the California law as requiring disclosure of material or information that would be relevant if the consumers knew it. But that's never been the test. And that goes back to California public policy expressed by the California Supreme Court in Sealy in 1965, that consumers can be fairly charged that the products they buy are not going to live up to their economic or other expectations unless the manufacturer agrees that they will. That's set forth. You know, that strikes me as really off to one side. Talk to me more or talk to us more about why we should not certify this to the California Supreme Court. I will say I'm speaking only for myself. I'm reluctant to hold, based on the case law in front of us, that California law goes as far as the plaintiffs would like it to go. But I might be interested in the view of the California Supreme Court on the question. Well, I think it requires first that there be, that the law be unclear. And, as I said, this court, the Ninth Circuit, has been unanimous on this question involving the Wilson rule. Do you think it's unfair to say that the district courts have been a bit befuddled? Well, but that's not for the California Supreme Court. This court corrects that. We can correct it, or we can say we're befuddled, too. Therefore, we'll ask the California Supreme Court. Right. But as recently as March of 2017, after hearing Rutledge arguments in a published decision, the court was not befuddled and issued a ruling reaffirming the Wilson rule. That was March 24th of this year. It's after the briefing was concluded, but it's included in our opposition to the petition for the Supreme Court, California Supreme Court. And I would also say, to your point earlier, Judge Berzon, was this isn't going to be case dispositive. It's not even going to persist. Well, that's the problem. That's what I think is the problem. Because their question, here's their question, must a pure omission-based consumer deception claim under the UCL, FAL, and CLRA involve a safety concern to be actionable? Even if the answer to that is no, which is what the plaintiffs want the answer to be, they still have not alleged any of a category that requires disclosure. They haven't alleged a warranty, and they haven't alleged any misrepresentations. So even if the answer to their question is ‑‑ Wait a minute. I don't understand what you're saying. So ‑‑ I mean, their argument, you keep going back to that, but it's a separate category, and it's a fair question whether or not ‑‑ I understand you're reading Rutledge the way you're reading Rutledge. I don't read Rutledge that way. But even if you're right about that, it's still a fair question whether or not beyond safety, the safety area, there is some area in which there is a duty to disclose. There is. No, the other two categories that you're so fond of. But ‑‑ I'm just repeating what Wilson says, Your Honor. I mean ‑‑ Okay. But the suggestion is that Wilson has been undermined by later California law. Right. And my point was it's not, because in Collins, this Court has already said twice, once in Gray and in Vitt, that Collins doesn't change anything. Granted, they're not reported decisions, but ‑‑ I really, I mean, really, this is a litigation advice. This Court is not interested for presidential reasons in its unpublished opinions. We, you know, maybe we should be. Maybe we should be publishing more. I think we probably should be publishing more. But we said it and we mean it. Okay. And it doesn't seem to be getting through to the bar very much at all. Okay. Well, let me put it this way then, Your Honor. Collins itself, in the Collins opinion, it distinguished itself from Doherty. And it said our facts in Collins are different than Doherty because the defect manifested during the warranty period and therefore we're not changing Doherty, we're not inconsistent with Doherty. We're different. And we're not trying to do an end run around the warranty laws that the Doherty Court was concerned about. So Collins doesn't change anything. And Rutledge, as I said, doesn't change. Do you want to say anything about the exclusive knowledge issue? Sure. I think that it's pretty clear that there's no exclusive knowledge here. Just looking at the allegations of the complaint. The allegations of the complaint talk about the fact that this has been discussed widely and publicly going back all the way to 2001 with the Harkin-Engel Protocol, with the Payson Center report in 2011, a CNN expose in 2013. And on top of all that, we have disclosures mandated by the State of California on their websites where anybody can take a phone and hit the website and there's the supply chain disclosures. That information is out there for everyone to see. And that's a lot easier than in the Rubenstein case that just came out. They actually imposed a duty on the consumer to go actually ask a sales associate, hey, do you all sell this stuff here in the factory outlet store? Is this the same stuff that you sell, you know, in your Gap store or your Banana Republic store? That's a much greater burden. In that case, Rubenstein said there's no exclusive knowledge because the consumer could avail himself or herself of that to determine the answer to those questions. So I think it's a very easy case on exclusive knowledge. The problem is the plaintiffs want to change the word exclusive to superior, and there's not a single state court decision that does that. I want to go back for a minute to this certification question. I don't think you – well, first of all, I gather you don't favor certification, do you? We don't think it's necessary. All right. But if it were to be certified, how would you frame the question? That would be up to the plaintiffs. I don't know because the problem is this court could affirm on the grounds as it did in Ebner, that Your Honor may remember the lip balm case, that there's no deception here. And that, as I said, the fact that people will pay more for a certification that something is free of forced labor or is a fair trade product, for example, that shows that they either don't have an expectation or they assume that there is some risk absent that certification. Or that they haven't thought about it. Or that they haven't thought about it, but then they're not being deceived if they haven't thought about it. Well, let me ask the question a little bit differently. This may be a little bit off the wall, but how do you think – how should I frame this? What is the – well, I've lost my train of thought now, but basically what? You believe there's no need for certification because the way you've discussed the case is clear enough for you? We think it's clear enough and it won't be dispositive because, you know, just on the exclusive knowledge, let's even assume that somebody said we're going to adopt the Lemandry factors, even though they originate in common law fraud and they've never really been analyzed by anybody. We're going to adopt those. They still lose on the exclusive knowledge point under those factors, just as the plaintiff did in the Rubenstein case just recently, this recent authority that was submitted to the court. I don't know if this would be helpful on certification, but to your understanding, what is the definition of the putative class? It's people who, within the state of California, or who purchased within the state of California these various products containing seafood, and some of them are cat food and some – I mean, just that they purchased it, not that they had an expectation of so-and-so? Well, they don't allege any facts saying that there was a reasonable expectation. All they allege is that this is a terrible problem that was out there in the public and that that's evidence that people care about this issue. But as I said, the fact that it's out there so publicly and on the Web sites undermines any idea that anybody has exclusive knowledge or that anybody here is being deceived. There's no claim here that anybody said anything untruthful. So if I'd like to – if you have questions, if the court does, about the safe harbor point, Mr. Merriman is prepared to address with the remaining time. But I would just say in closing that their claims depend on a legal duty that's been never applied in this court or any California state court, and we would ask that the judgments be affirmed. And I'd like to hand over some time to Mr. Merriman, if I may. Okay. Thank you. Good afternoon. May it please the Court. Brian Merriman on behalf of Nestle Purina Pet Care Company and Nestle USA. I'd like to address briefly the safe harbor doctrine. This court, in addition to affirming because there's no duty to disclose in all seven cases, can also affirm all seven cases on the basis that the safe harbor doctrine bars plaintiffs' consumer protection claims as the district courts and the seafood supply claims did in Barber, DeRosa, Hughes, and Wirth. The safe harbor doctrine precludes the plaintiffs here from bringing claims where the legislature has considered the situation and concluded expressly or implicitly that no action should lie. That's found in three California Supreme Court cases, starting with Celtec and then continuing most recently in 2000. But you're, I mean, in order to come to the conclusion that that's what happened here, you have to get yourself mired in the vagaries and oddities of California legislative history, which are always very murky. How do we know what they considered and who considered it and what decisions were made? And why should we be deciding on the basis, we know what they ultimately did, which doesn't preclude anything. It has a savings clause that seems to say that other statutory causes of action survive. It doesn't say it's just fine to not disclose this, and it doesn't otherwise address the question. It just says you have to do this one thing. It doesn't say you don't have to do something else. Well, Your Honor, I think it's clear from the legislative history and the drafting of the bill that initially the legislature considered a lot more. They considered requiring companies not just to disclose their efforts but to actually take actions to eradicate forced labor. Okay. Well, did they ever consider whether somebody should, whether there should be a disclosure on a package of what was known? So there's nothing in the legislative history that's specific. Besides which, I don't know what legislative, I mean, I've worked with California legislative history. It's funny stuff. You go to the governor's office, you take some pieces of paper out of his file, and you go over to other legislators and you take out their files. It's not, there is no congressional record, and there's nothing official. It's just stuff. Well, here, Your Honor, we have the legislative history that's in the record and cited in all the briefs. There are actually committee discussions and comments and notes as to why the legislature was doing what they were doing. Well, why the committee sought that but now goes to the legislature. We don't know what they thought. That's correct. But the legislature made it clear that what they were, the purpose of the act. No, the committee report that you read. Yes, Your Honor. The committees made it clear that the purpose of the act was to set a standard which would have an adequate disclosure that allows consumers to make an informed purchasing decision. The stated purpose of the act is clear. And then it's also clear from the legislative history that they thought that this would provide California consumers with adequate information and that if companies disclosed on their websites certain information, that that would provide the California consumer with he or she needs. Should we care at all about the fact that the California Attorney General, which is not otherwise supporting the plaintiffs, emphatically, is of the view that this is not the case? Well, in this particular case, Your Honor, although courts typically do give, afford some deference to the California Attorney General, the case law is clear that that's appropriate when the statute is highly technical and the agency was intimately involved with the drafting of that statute. And neither of those is the case here. So, and if I may address the Savings Clause briefly, Judge Verzombi, because Your Honor raised it. The Savings Clause focuses exclusively on the remedies. That's the language of the Savings Clause. Available to a private party for conduct that may violate the statute. Here, it doesn't broaden the scope of the conduct the legislature considered and made lawful or unlawful. The inquiry under the Safe Harbor Doctrine is simply what conduct the legislature considered and either permitted or explicitly or implicitly determined no action should be taken. If we, speaking hypothetically now, if we should certify the underlying disclosure question to the California Supreme Court, you think we should also certify the Safe Harbor question or not? I don't think it's necessary, Your Honor, because here we have a Well, the California Attorney General disagrees with you, right? Correct, Your Honor. But the California Attorney General is in no better position to assess this issue than the parties here. But in furtherance of Judge Tashima's question, you think it's not necessary to certify the Safe Harbor question, but if you're right on the Safe Harbor question, it doesn't matter what the California Supreme Court would answer as to the first question. That's correct, Your Honor. So I think both questions are relevant to the ultimate answer. I think the short answer, Your Honor, is here you have three California Supreme Court cases, CELTEC, Zhang v. Superior Court, and Loeffler v. Target. Those two within the last four years interpreting CELTEC in a way which would allow the Safe Harbor Doctrine to apply here. The court has three published Ninth Circuit opinions, Alvarez, Ebner, and Davis. All of which, the facts of this case, fall within the application of the Safe Harbor Doctrine. Okay. Thank you, Your Honor. Thank you very much. You've saved some time. Thank you, Your Honor. On the issue of certification to the California Supreme Court, I would say two things. Counsel said that Collins didn't change the law. But at least two district judges in the Lenovo case and the Norica case wrote at length, and I think with some clarity, that they believe there was a change in the law. And Judge Carter believes that there is no change in the law, that he's bound by Wilson. So you have district courts down below horribly confused on this issue. And if the court feels constrained— If we thought we knew the answer, we could give the answer. The question is, do we know the answer? In other words, as far as a district court is being confused, we can enlighten them if there's something to enlighten them about. But what is there to enlighten them about? Yes, and the point I was trying to make, if you feel as a matter of precedent that you can't overrule or modify Wilson because you're another panel, then I think the likely outcome here, or the best outcome here, given the confusion below, is to certify it to the Supreme Court. Now, to say that it's not outcome determinative, it doesn't have to be. Yes, it has to be. That's a problem because the California Supreme Court does not want to spin its wheels. So the requirements for certification under the California Supreme Court's rules for certification, we have to certify that it would be outcome determinative. Okay, and I think it would be because what counsel said, the reason it might not be outcome determinative is the superior knowledge problem. It seems to me that if this goes up on what is the duty to disclose in an omissions case, the California Supreme Court is going to have to deal with when there's a duty, and we believe there's a duty when it's material and the four Lomardi factors are met. So the court's going to have to look at the second Lomardi factor, superior knowledge, in this case in order to decide this question. So how is the question asked that will give us, then, a dispositive answer? I think the question asked would be in a case where there's no claim of false representation, a pure omissions claim, is there a duty to disclose, and has the Lomardi factor, too, been met in this case? That is to say, with the allegations of your complaint as part of the question. That's correct. And what do we do with the safe harbor issue? I think you either wait or you rule in our favor, because I don't think there's a close question there. As Judge Teshima wrote in the Ebner case, you either permit the conduct, which this conduct has not been permitted by the statute, or you bar the conduct. This conduct has not been an action has not been the actions aren't barred by the statute. The statute is clear on that, and you don't go to the legislative history. So I think the safe harbor one is clear. So you think that answer is clear enough. If it doesn't, we can answer that ourselves in the way that you would prefer the answer to be. Yes. Or if you really want more guidance from the California Supreme Court, we would have no objection taking it all up, unless there are further questions. That's all I have, Your Honors. Okay. Thank you. Thank both sides for their arguments. The cluster of cases, the first one of which is Barber v. Nestle USA and Nestle Perina, now submitted for discussion.
judges: Tashima, W. Fletcher, Berzon